IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                    Plaintiff,<br><br>v.<br><br>BRYON D. WALLACE,<br><br>                    Defendant. | **MEMORANDUM DECISION AND ORDER DENYING MOTION TO SUPPRESS**<br><br>Case No. 2:14-cr-585-DN<br><br>District Judge David Nuffer |

Defendant Bryon D. Wallace moves to suppress evidence[1] discovered as a result of traffic stop on November 4, 2014. On January 20, 2015 the court held an evidentiary hearing on the motion.[2] As directed, the parties submitted their positions in the form of draft orders.[3] Argument was heard on April 14, 2015.[4] After a thorough review and consideration of the evidence, arguments, and draft orders submitted by the parties, the motion to suppress is denied.

---

[1] Motion to Suppress, docket no. 19, filed December 17, 2014.

[2] Minute Entry, docket no. 24, filed January 20, 2015.

[3] Governments' Proposed Findings of Fact and Conclusions of Law, docket no. 30, filed March 3, 2015; Defendant's Proposed Findings of Fact and Conclusions of Law, docket no. 31, filed March 20, 2015.

[4] Minute Entry, docket no. 33, filed April 14, 2015.

FINDINGS OF FACT.................................................................................................. 2

DISCUSSION ......................................................................................................... 12

    1. The Stop Was Supported by Reasonable Suspicion ..................................... 12

    2. Investigative Detention Was Supported by Reasonable Suspicion ............................. 13

        a.      Criminal History ................................................................ 15

        b.      Nervousness .................................................................. 16

        c.      Mode and Time of Travel ....................................................... 17

        d.      Totality of the Factors ........................................................ 19

    3. The Search Was Based on Probable Cause.................................................. 20

    4. Consent to Search Was Not Revoked ...................................................... 20

ORDER ................................................................................................................. 23

## FINDINGS OF FACT

On November 4, 2014, Trooper Niel Ekberg was working a formal saturation project in Summit County with his interdiction K-9 team.[5] As part of that saturation project, there were ten K-9 handlers and four or five other interdiction team members that did not have K-9s.[6] The saturation project is a week-long 24-hour coverage.[7] Generally, when working on an interdiction or saturation team, the team aggressively looks for drug trafficking and other criminal activities with people traveling through the state of Utah.[8] While working on an interdiction or saturation

---

[5] Transcript, page 22, Lines 15-24, docket no. 25, filed January 27, 2015.

[6] Transcript, page 23, lines 1-3.

[7] Transcript, page 23, lines 4-6.

[8] Transcript, page 8, lines 11-20.

program, Trooper Ekberg proactively makes high volume traffic stops and aggressively looks for indications of criminal activity.[9] The saturation project teams are broken down into three different shifts, a morning shift, a night shift and a graveyard shift.[10] On November 3 and 4, 2014, Trooper Ekberg was working the 9:00 p.m. to 5:00 a.m. graveyard shift on Interstate 80 in Summit County.[11] Trooper Ekberg testified that on I-80 where the saturation project occurred is known to be a large drug trafficking corridor because it goes from the west to the east.[12]

       Trooper Ekberg has been a trooper with the Utah Highway Patrol for eight and one half years.[13] He has been on a special interdiction team and has been assigned a drug-detection-trained police K-9 for six and one half years.[14] Trooper Ekberg has had extensive training in interdiction, including Desert Snow in 2009;[15] HIDTA/Shawn Smart Interdiction training also in 2009;[16] DIAP-sponsored interdiction training in 2010 in New Orleans;[17] in San Antonio, Texas in 2013;[18] and in Grand Rapids, Michigan in 2014,[19] which were all week-long trainings. Collectively, those training sessions taught Trooper Ekberg that people involved in criminal activity such as drug trafficking often display behaviors and respond to law enforcement questions differently than those who are not criminally involved, and taught Trooper Ekberg how

---

[9] Transcript, page 8, line 24 through page 9, line 6.

[10] Transcript, page 23, lines 6-8.

[11] Transcript, page 23, lines 9-25.

[12] Transcript, page 23, lines 18-25.

[13] Transcript, page 6, line 23 through page 7, line 4.

[14] Transcript, page 7, lines 14-24; page 18, lines 2-6.

[15] Transcript, page 9, line 18 through page 10, line 19.

[16] Transcript, page 11, lines 14-25.

[17] Transcript, page 14, lines 3-25.

[18] Transcript, page 16, lines 2-14.

[19] Transcript, page 16, lines 2-14.

to recognize those indicators of criminal behavior.[20] In addition to his extensive classroom training, Trooper Ekberg has made thousands of traffic stops during the course of his interdiction assignment starting in 2009, which has equipped him with the experience to make roadside distinctions between the innocent motoring public and those involved in other criminal activity.[21] As Trooper Ekberg was specifically working a formal interdiction saturation project on the morning of November 4, 2014,[22] he was using his training and experience during traffic stops to determine if anything illegal was going on.

On November 4, 2014, between 3:56 a.m. and 3:57 a.m., Trooper Ekberg stopped a gold minivan on Interstate 80 eastbound near Milepost 159 between Wanship and Coalville, Utah.[23] Trooper Ekberg testified that using stationary orange barrels as a reference point, he was able to determine by counting seconds that the van was not traveling a full two seconds behind the semi-truck, as is required by Utah Code Section 41-6a-711.[24] The minivan had New Jersey plates, and Trooper Ekberg testified he did not know if he would have pulled the vehicle over if it had Utah plates.[25] Upon approaching the passenger side of the vehicle, Trooper Ekberg introduced himself and told the driver that the reason for the stop was that he observed the van following a semi-truck too closely and at an unsafe distance through a construction zone.[26] The driver responded by asking if he was tailgating a little bit. Trooper Ekberg confirmed that the driver was tailgating

---

[20] Transcript, page 15, lines 17-24.

[21] Transcript, page 19, line 21 though page 21, line 7; page 22, lines 5-12.

[22] Transcript, page 22, lines 19-24.

[23] Transcript, page 29, lines 9-14; page 66, lines 19-25; Video at 3:56:50.

[24] Transcript, page 26, line 15 through page 28, line 18; Plaintiff's Ex. 1.

[25] Transcript, page 68, lines 15-25.

[26] Transcript, page 31, lines 17-25; page 68, lines 3-14; Video at 3:57:50.

and educated the driver on safe following distances.[27] The driver and sole occupant of the

minivan was identified by his New Jersey driver's license as Bryon Wallace.[28] Trooper Ekberg's

dash camera fairly and accurately recorded his interaction with Mr. Wallace throughout the

course of the traffic stop, and that video recording was admitted as Plaintiff's Exhibit 2.[29]

   Trooper Ekberg testified that when he introduced himself, Mr. Wallace was very quiet

and reserved.[30] One of the initial things Trooper Ekberg noted about Mr. Wallace was that his

van had New Jersey license plates and he had a New Jersey driver's license.[31] When asked about

his travels, Mr. Wallace said he was headed home to New Jersey.[32] Trooper Ekberg noted that

gold minivan was very clean, had some dress shirts hanging up behind the driver on a hanger and

that on the passenger side front seat there was a leather portfolio that looked like it was open.[33]

Because of these observations, Trooper Ekberg asked Mr. Wallace if he traveling was on

business.[34] Mr. Wallace stated that he was not on business, but that he had been on a month-long

vacation in San Francisco visiting friends.[35] Trooper Ekberg stated that a month-long vacation

was a long vacation because he had never taken a month-long vacation.[36] It struck Trooper

Ekberg as unusual and odd that Mr. Wallace would take a month-long vacation.[37] Further,

Trooper Ekberg felt that his observation of the van with very few contents did not match Mr.

---

[27] Transcript, page 31, line 22 through page 32, line 1; page 67, lines 9-10.

[28] Transcript, page 32, lines 5-18; Video at 3:58:20.

[29] Transcript, page 29, line 17 through page 30, line 1; page 30, lines 18-25; Plaintiff's Ex. 2.

[30] Transcript, page 34, lines 2-6.

[31] Transcript, page 32, lines 18-24.

[32] Transcript, page 34, lines 7-9; Video at 3:58.18.

[33] Transcript, page 34, lines 10-14; *see* Plaintiff's Ex. 3 (picture of open portfolio).

[34] Transcript, page 34, lines 14 -17; Video at 3:58:35

[35] Transcript, page 34, lines 17-20; Video at 3:58:38 and 3:59:50.

[36] Transcript, page 35, Lines 2-4.

[37] Transcript, page 35, lines 1-9.

Wallace's explanation of having been on vacation for a month.[38] Trooper Ekberg stated that in some of the drug seizures he has made, there was little or no luggage.[39]

Mr. Wallace freely provided Trooper Ekberg with his license, proof of insurance and proof of registration.[40] When Mr. Wallace handed Trooper Ekberg his driver's license, Mr. Wallace was visibly shaking.[41] Trooper Ekberg said that it was cold outside that morning and even commented to Mr. Wallace how cold it was outside.[42] Trooper Ekberg also noticed that Mr. Wallace would not make eye contact with him – rather Mr. Wallace would look out the front windshield of the van, even when he was talking to Trooper Ekberg.[43] Trooper Ekberg also noted that in his experience, it is unusual for an innocent motorist to be traveling alone through the night, as contrasted to drug couriers who often drive through the night as a way to reduce the chance of law enforcement contact.[44] Trooper Ekberg testified that after Mr. Wallace provided him with his license, proof of insurance and proof of registration, that Trooper Ekberg shined his flashlight into the back of the Mr. Wallace's vehicle and saw a small, "carryon-type luggage travel bag."[45] The suitcase was half the width of the back seat, and Trooper Ekberg conceded that is was large enough to carry a number of pairs of pants, undergarments, and shorts.[46] When

---

[38] Transcript, page 38, lines 4-16.

[39] Transcript, page 38, lines 19-21.

[40] Transcript, page 75, lines 1-4.

[41] Transcript, page 35, lines 17-23; page 36, lines 14-15.

[42] Transcript, page 74, lines 17-25.

[43] Transcript, page 36, lines 12-22.

[44] Transcript, page 42, lines 1-10.

[45] Transcript, page 38, lines 2-3.

[46] Transcript, page 72 line 21 through page 73, line 10.

looking into the van with his flashlight, Trooper Ekberg did not see any illegal contraband in plain sight.[47]

　　　After his initial contact and conversation with Mr. Wallace, Trooper Ekberg returned to his patrol vehicle at 4:00 a.m. and asked dispatch to do a records check on Mr. Wallace and his vehicle.[48] Dispatch informed Trooper Ekberg that Mr. Wallace had a valid driver's license, that there were no outstanding active warrants, the vehicle was properly registered, and that Mr. Wallace had a previous arrest in 2011 by DEA [Drug Enforcement Administration] for a money laundering and heroin conspiracy, but there was no information whether Mr. Wallace had been convicted of anything.[49]

　　　Trooper Ekberg determined that Mr. Wallace had a valid driver's license, that his vehicle was properly registered, that the vehicle had appropriate insurance and that there were no outstanding warrants for Mr. Wallace by 4:08 a.m.[50] Trooper Ekberg prepared a written warning for Mr. Wallace for following too closely.[51] At approximately 4:09 a.m., with the written warning, as well as his license, registration, and insurance card, Trooper Ekberg returned to the van and handed the documents back to Mr. Wallace through the passenger window.[52] Trooper Ekberg specifically told Mr. Wallace that he was only giving him a written warning for following too closely.[53] Trooper Ekberg pointed out that Mr. Wallace's vehicle insurance had recently expired and advised Mr. Wallace to address the insurance issue when he returned back

---

[47] Transcript, page 75, lines 20-24.

[48] Transcript, page 42, lines 11-21; page 75, lines 18-19; Video at 4:02:20.

[49] Transcript, page 44, lines 2-14; page 75, line 25 through page 76, line 7; page 78, lines 13 through page 79, line 9; Video at 4:07:45 through 4:08:40.

[50] Transcript, page 78, lines 9-12.

[51] Transcript, page 45, lines 12-16; page 80, lines 8-11.

[52] Video at 4:09:09.

[53] Transcript, page 45, line 21 through page 46, line 4; page 79, lines 10-12; page 94, lines 3-6.

to New Jersey.[54] Mr. Wallace then showed Trooper Ekberg that he had the new card that took effect October 31, a few days before the traffic stop on November 4.[55] Mr. Wallace explained that he had the new insurance card overnighted to him in San Francisco.[56] Mr. Wallace also said that he was coming from San Francisco and had been driving for 10 or 12 hours straight since three o'clock the previous afternoon.[57]

Even after explaining to Mr. Wallace that he was getting a written warning and not a ticket with a fine, Mr. Wallace continued to show signs of nervousness such as fidgety movements and noticeably heavy breathing, to an extent that Trooper Ekberg asked Mr. Wallace if he was okay.[58] During this continued conversation after the written warning was given, Mr. Wallace still did not make eye contact with Trooper Ekberg, and continued to look forward out the front windshield instead.[59] Trooper Ekberg asked Mr. Wallace what he did for work such that he could take a month-long vacation, and Mr. Wallace responded that he was a builder.[60] When asked a builder of what, he responded, "self-employed, and then added that he was a very successful contractor."[61] That response caused Trooper Ekberg to wonder why a successful contractor would drive cross-country for vacation instead of fly, and would be driving a 2005

---

[54] Transcript, page 50, lines 1-22; Video at 4:10:00 – 4:10:20.

[55] Transcript, page 50, lines 1-21; Video at 4:10:00.

[56] Transcript, page 50, lines 21-22; Video at 4:10:20.

[57] Transcript, page 61, line 21 through page 62, line 1; Video at 4:11:35.

[58] Transcript, page 46, lines 4-13.

[59] Transcript, page 47, lines 5-11.

[60] Transcript, page 47, lines 18-19; Video at 4:09:10.

[61] Transcript, page 47, lines 19-23. Video at 4:09:20.

Saturn minivan.[62] Trooper Ekberg testified that he never told Mr. Wallace that he was free to leave because he wanted to follow up on his concerns and suspicions.[63]

At approximately 4:11:50 a.m., after these further conversations, Trooper Ekberg asked Mr. Wallace if he had anything illegal in the van.[64] Mr. Wallace responded "no," and stated that he was insulted that Trooper Ekberg would ask such a question.[65] Trooper Ekberg then asked Mr. Wallace if he had ever been arrested.[66] Mr. Wallace immediately responded "no," but then clarified whether the question was about arrests for drugs, and responded that he had never been arrested for drugs, and in fact had never been involved with or taken drugs in his whole life.[67] At 4:13 a.m. Trooper Ekberg asked Mr. Wallace for consent to search his van.[68] Mr. Wallace responded, "go ahead."[69] Trooper Ekberg was surprised by Mr. Wallace's response, so he asked a second time if he could search the van, and Mr. Wallace again responded "go ahead."[70] When asked to get his coat, Mr. Wallace became agitated and did not get his coat or move from the driver's seat of the van.[71] Mr. Wallace then responded by saying, "I don't understand. You are asking to search my vehicle?"[72] At 4:13:25 a.m., Trooper Ekberg advised Mr. Wallace that he could say no to a search of his vehicle.[73] Instead, Mr. Wallace asked Trooper Ekberg, "can I go

---

[62] Transcript, page 48, lines 1-6; page 49, lines 6-12.

[63] Transcript, page 80, line 1 through page 82, line 4.

[64] Transcript, page 52, lines 11-13; page 86, lines 19-22; Video at 4:11:51.

[65] Transcript, page 52, line 15 through page 53, line 8; page 86, line 23 through page 87, line 11; Video at 4:12:00.

[66] Transcript, page 53, lines 24-25; Video at 4:12:15.

[67] Transcript, page 54, lines 1-13; Video at 4:12:15.

[68] Transcript, page 55, lines 10-14; page 88, lines 18-20; Video at 4:13:00.

[69] Transcript, page 55, line 15; page 88, lines 18-24; Video at 4:13:06.

[70] Transcript, page 55, lines 15-20; page 88, line 25 through page 89, line 1; Video at 4:13:09.

[71] Transcript, page 56, lines 4-12; Video at 4:13:13.

[72] Transcript, page 89, lines 3-5.

[73] Transcript, page 89, lines 12-14.

to a hotel?"[74] Trooper Ekberg tried to clarify the question and responded by repeating the question, "can you go to a hotel?"[75] Mr. Wallace then stated that he wanted to go to a hotel and lay down.[76] Trooper Ekberg responded by saying "let's back up."[77] Trooper Ekberg then explained that he was asking for consent to search based on how Mr. Wallace was acting, and his answers to Trooper Ekberg's questions.[78]

Trooper Ekberg next confronted Mr. Wallace with the criminal history information given to him by dispatch, which noted a prior arrest for money laundering and heroin.[79] Mr. Wallace responded that such an arrest was "improbable."[80] Trooper Ekberg asked Mr. Wallace if he would like the criminal history information double-checked to see whether there may have been a mistake.[81] Mr. Wallace responded that he would like the information double-checked, and said that he would like to get to a hotel, but if Trooper Ekberg needed to do his job then do it.[82] At approximately 4:16 a.m., Trooper Ekberg got Mr. Wallace's social security number, and gave that to dispatch to double-check whether the 2011 drug and money laundering arrest was tied to Mr. Wallace through that social security number.[83] At 4:21 a.m., Trooper Ekberg spoke with Trooper Terry.[84] During his conversation with Trooper Terry, Trooper Ekberg made the following statements with respect to his conversation with Mr. Wallace: "I'm just asking

---

[74] Transcript, page 89, lines 15-17; Video at 4:13:25.

[75] Transcript, page 89, line 22 through page 90, line 3; Video at 4:13:27.

[76] Transcript, page 90, lines 4-7; Video at 4:13:30.

[77] Transcript, page 56, lines 13-15; Video at 4:13:35.

[78] Transcript, page 56, lines 18-22; Video at 4:14:00.

[79] Transcript, page 57, lines 1-3 and lines 22-23; Video at 4:14:15.

[80] Transcript, page 57, lines 3-4; page 63, lines 7-9; Video at 4:14:26.

[81] Transcript, page 57 line 24 through page 58, line 5; page 63, lines 5-8; Video at 4:14:29.

[82] Transcript, page 58, lines 5-8; page 63, lines 9-10; Video at 4:16:04.

[83] Transcript, page 59, lines 1-12; page 92, lines 7-12; Video at 4:16:30.

[84] Transcript, Page 92, Lines 13-20.

questions, doing my job. And he totally went from cooperative and nice to he actually gave me consent. And he said, well, can I go to a hotel."[85] Trooper Ekberg then told Trooper Terry, "so I'm going to run Sarge or keep trying to have him let me search his van."[86] Dispatch confirmed that the social security number matched the criminal history previously given to Trooper Ekberg containing the prior arrest.[87]

After receiving the confirmation from dispatch, Trooper Ekberg returned to the van at 4:22:45 a.m. and told Mr. Wallace that there was some conflict and without explaining what the conflict was, Trooper Ekberg said that he was going to run the K-9 police dog around the van.[88] Mr. Wallace responded in the affirmative to Trooper Ekberg's explanation of what was going to happen.[89] Instead of asking Mr. Wallace to get out of the van again, Trooper Ekberg asked Mr. Wallace to roll up his windows and deployed his dog at approximately 4:23 a.m.[90] The dog immediately indicated to the odor of narcotics on both the driver and passenger side rear sliding doors of the van.[91] A search revealed approximately 6-7 kilos of cocaine secreted inside the rear sliding doors of Mr. Wallace's van.[92]

---

[85] Transcript, Page 93, Lines 11-15.

[86] Transcript, Page 93, Lines 16-19.

[87] Transcript, page 59, lines 13-17; Video at 4:18:45 through 4:19:30.

[88] Transcript, page 60, lines 7-11; page 96, lines 9-11; Video at 4:22:50.

[89] Transcript, page 60, line 11; page 96, lines 12-14; Video at 4:22:50.

[90] Transcript, page 94, lines 1-2; Video at 4:23:20.

[91] Transcript, page 60, lines 19-25; Video at 4:24:08 and 4:24:40.

[92] Transcript, page 61, lines 9-15.

## DISCUSSION

### 1. The Stop Was Supported by Reasonable Suspicion

It is well established that officers may stop a vehicle and investigate further or issue a citation for "any one of the multitude of applicable traffic and equipment regulations."[93] "An observed traffic violation or a reasonable suspicion of such a violation under state law plainly justifies a stop."[94] To have a reasonable, articulable suspicion, an officer must have "some minimal level of objective justification for making the stop."[95] The officer's subjective motivation for the stop is irrelevant to the determination of reasonableness under the Fourth Amendment.[96]

Trooper Ekberg observed Mr. Wallace's van following a semi-truck through a construction zone at approximately 47 miles per hour with only two to three vehicle lengths between the two vehicles.[97] Trooper Ekberg counted the following distance in seconds, using orange construction barrels as a fixed point, and determined that Mr. Wallace's following distance was less than two seconds.[98] Trooper Ekberg also observed that the Wallace vehicle was so close to the semi-truck that it was unlikely that the semi driver could see Wallace's vehicle in his rear view mirror.[99] Utah Code Section 41-6a-711 requires that a vehicle follow no closer than

---

[93] *United States v. Botero-Ospina*, 71 F.3d 783, 787 (10th Cir. 1995) (citation omitted).

[94] *United States v. Gregoire*, 425 F.3d 872, 876 (10th Cir. 2005).

[95] *United States v. Winder*, 557 F.3d 1129, 1134 (10th Cir. 2009) (citation and internal quotation marks omitted).

[96] *Whren v. United States*, 517 U.S. 806, 810-13 (1996); *see also United States v. Polly*, 630 F.3d 991, 997 (10th Cir. 2011) (finding that a traffic stop is legally justifiable even when the officer's primary reason for conducting the stop is to investigate drug trafficking).

[97] Transcript, page 26, lines 12-17.

[98] Transcript, page 26, lines 17-22.

[99] Transcript, page 26, line 23 through page 27, line 2.

two seconds behind the vehicle directly in front.[100] As Mr. Wallace was observed to be following

the semi-truck too closely, in violation of the statute, Trooper Ekberg made a lawful stop of the

Wallace vehicle for that violation.

### 2. Investigative Detention Was Supported by Reasonable Suspicion

To justify an investigative detention, the detaining officer must have a reasonable,

articulable suspicion that the detainee has been, is, or is about to be engaged in criminal

activity.[101]

> Reasonable suspicion is a less demanding standard than probable cause not only
> in the sense that reasonable suspicion can be established with information that is
> different in quantity or content than that required to establish probable cause, but
> also in the sense that reasonable suspicion can arise from information that is less
> reliable than that required to show probable cause.[102]

Reasonable suspicion is a "particularized and objective basis for suspecting the person stopped of

criminal activity."[103] The presence of reasonable suspicion is not determined by any one factor,

but on the totality of the circumstances.[104] This approach is intended to avoid unrealistic second-

guessing of police officers' decisions,[105] and to accord appropriate deference to the ability of a

trained law enforcement officer to distinguish between innocent and suspicious actions.[106]

Details which may be compatible with innocent behavior or explanation may be considered in

the totality of the circumstances approach.[107]

---

[100] *See* Motion to Suppress Hearing, Ex. 1.

[101] *Terry v. Ohio*, 392 U.S. 1, 21 (1968).

[102] *United States v. Treto-Haro*, 287 F.3d 1000, 1004 (10th Cir. 2002).

[103] *United States v. Callerman*, 273 F.3d 1284, 1286 (10th Cir. 2001) (citation and internal quotation marks omitted).

[104] *Alabama v. White*, 496 U.S. 325, 330 (1990).

[105] *United States v. Melendez-Garcia*, 28 F.3d 1046, 1052 (10th Cir. 1994).

[106] *United States v. Lopez-Martinez*, 25 F.3d 1481, 1484 (10th Cir. 1994).

[107] *United States v. Cervine*, 347 F.3d 865, 871 (10th Cir. 2003).

The reviewing court must consider whether the officer had sufficient articulable facts meriting further investigation to either confirm or dispel that reasonable suspicion.[108] Police officers need not close their eyes to suspicious circumstances.[109] In making a determination of reasonable suspicion, the relevant inquiry is not whether particular conduct is "innocent" or "guilty," but the degree of suspicion that attaches to particular types of noncriminal acts.[110]

Law enforcement officers' training and experience in recognizing signs of drug trafficking is entitled to consideration and some deference, especially when those signs may be individually capable of innocent explanation.[111] Even if witnessed conduct is by itself lawful, or is ambiguous and susceptible of an innocent explanation, "*Terry* recognized that the officers could detain the individuals to resolve the ambiguity."[112] The reasonable suspicion evaluation is therefore made "from the perspective of the reasonable *officer*, not the reasonable *person*."[113]

As explained above, the traffic stop of Mr. Wallace was justified by an observed traffic violation. Trooper Ekberg's processing of the traffic violation that justified the stop was completed at 4:09 a.m., when Trooper Ekberg gave Mr. Wallace a written warning for following too close. The drug sniff by the K-9 began at 4:22 a.m. and was completed at 4:24 a.m. The critical question is whether Trooper Ekberg had reasonable suspicion to detain Mr. Wallace for that thirteen to fifteen minute period between issuing the warning and the K-9 drug sniff.

Trooper Ekberg has extensive and significant training and experience in the area of drug interdiction. Because of that training and experience, some deference is given to Trooper

---

[108] *Id.*

[109] *United States v. Espinosa*, 782 F.2d 888, 891 (10th Cir. 1986).

[110] *United States v. Sokolow*, 490 U.S. 1, 10 (1989).

[111] *Cervine*, 347 F.3d at 871.

[112] *Illinois v. Wardlow*, 528 U.S. 119, 125 (2000).

[113] *United States v. Quintana-Garcia*, 343 F.3d 1266, 1270 (10th Cir. 2003).

Ekberg's articulation of how certain facts, even though not criminal or even suspicious to an untrained observer, contribute to his formulation of reasonable suspicion. Each articulated factor must be analyzed independently and collectively to "judge [Trooper Ekberg's] conduct in light of common sense and ordinary human experience."[114] But "[r]easonable suspicion is not, and is not meant to be, an onerous standard."[115]

The facts presented through the testimony of Trooper Ekberg can be broadly placed into three main categories. Each category will be considered in turn for its contribution to a reasonable suspicion analysis.

### a.    Criminal History

Although a person with a criminal record could not be pulled over or detained for investigation based on the record itself, such a record is one factor that may justify further detention and that may cast a suspicious light on other seemingly innocent behavior. "[I]n conjunction with other factors, criminal history contributes powerfully to the reasonable suspicion calculus."[116] Here, Mr. Wallace's criminal history showed an arrest for money laundering and heroin conspiracy. Based on other observations, Trooper Ekberg already suspected drug trafficking even before obtaining Mr. Wallace's criminal history. The drug related arrest added to his suspicions. Mr. Wallace further added to Trooper Ekberg's suspicion by denying that he had ever been previously arrested for drugs, even after being directly confronted with the criminal history information received from dispatch. Indeed, his response that a prior drug arrest was "improbable" provided more reason for Trooper Ekberg to make further inquiries. It was reasonable for Trooper Ekberg to detain Mr. Wallace long enough to

---

[114] *United States v Mendez*, 118 F.3d 1426, 1431 (10th Cir. 1997); *Melendez-Garcia*, 28 F.3d at 1052.

[115] *United States v. Simpson*, 609 F.3d 1140, 1153 (10th Cir. 2010).

[116] *Id*. at 1147 (citation and internal quotation marks omitted).

double check the discrepancy about criminal history using Mr. Wallace's social security number. Confirmation was returned by dispatch at 4:18 a.m. Based on this factor alone, Trooper Ekberg had reasonable suspicion to detain Mr. Wallace from 4:09 a.m. when the written warning was given until 4:18 when criminal history confirmation was received. Confirmation of the prior drug arrest that Mr. Wallace had denied heightened Trooper Ekberg's then-present reasonable suspicion of drug trafficking.

Confirmation of Mr. Wallace's prior arrest for a money laundering and heroin conspiracy, and Mr. Wallace's denial of that prior arrest, contribute significantly to a reasonable suspicion determination.

### b.    Nervousness

The Tenth Circuit has "held consistently that nervousness is of limited significance in determining whether reasonable suspicion exists."[117] Extreme and persistent nervousness, however, "is entitled to somewhat more weight."[118] Specific indicia that the defendant's nervousness was extreme needs to be explored, rather than credit an officer's naked assertion.[119]

Trooper Ekberg articulated that Mr. Wallace's nervousness was beyond that observed in a "normal" traffic stop.  Mr. Wallace's hand was visibly shaking when he handed Trooper Ekberg his driver's license. His breathing was noticeably heavy. He became agitated when asked about drugs, which Trooper Ekberg has found to be a sign of nervousness. Mr. Wallace continually and persistently neglected to make eye contact with Trooper Ekberg when conversing with him. Also, Mr. Wallace's nervousness did not abate after he was told repeatedly that he was receiving a written warning for the traffic violation and not a ticket. He continued to

---

[117] *United States v. Williams*, 271 F.3d 1262, 1268 (10th Cir. 2001) (internal quotation marks omitted).

[118] *United States v. West*, 219 F.3d 1171, 1179 (10th Cir. 2000).

[119] *United States v. Santos*, 403 F.3d at 1127.

be fidgety, to breathe heavily, to avoid eye contact, and to display physical signs of nervousness to the extent that Trooper Ekberg asked him if he was okay.[120] These physical manifestations of extreme nervousness and failure calm down when assured of a warning are precisely the factors that the Tenth Circuit has articulated as creditable factors in a finding of reasonable suspicion.[121] Consequently, Mr. Wallace's nervousness also contributes significantly to a finding of reasonable suspicion.

> ### c.      Mode and Time of Travel

Implausible, inconsistent, or unusual travel plans can contribute to reasonable suspicion.[122] But the Tenth Circuit cases are wide-ranging as to how this factor should be considered and how much weight particular facts should be given in the overall reasonable suspicion analysis.[123] Facts relating to travel plans must be considered while giving limited deference to Trooper Ekberg's training and expertise in interdiction as well as in light of common sense and ordinary human experience.[124]

A number of facts are considered under this broad category. The fact that Mr. Wallace said he spent a month on vacation in San Francisco, the fact that his van was relatively neat and tidy, and the fact that he only had only one carry-on size suitcase and a few hanging shirts have some but little weight in the reasonable suspicion analysis. That Mr. Wallace was traveling eastbound on Interstate 80 from California to New Jersey does not add to the analysis. Although there is undoubtedly drug transportation that occurs on Interstate 80, to find it and many other

---

[120] Transcript, page 46, lines 1-13.

[121] *Simpson*, 609 F.3d at 1148.

[122] *Id*.

[123] *Id*. at 1148-51.

[124] *Mendez*, 118 F.3d at 1431.

interstate highways to be part of a general "drug corridor" is asking too much.[125] Far more innocent travel than drug transportation occurs on the interstate highways.

But there are facts that are significant. First, the combination of facts that the van has New Jersey plates, is being driven by a lone male, and is traveling eastbound in Summit County at 4:00 a.m. become significant when viewed through Trooper Ekberg's training and experience. Trooper Ekberg testified that drug traffickers often travel at night because there is often little to no law enforcement patrolling the highways at that time.[126] Trooper Ekberg also testified that drugs are frequently transported at night by lone male drivers.[127] These factors cumulatively became more suspicious when Mr. Wallace indicated that he had been driving straight from San Francisco for 10 to 12 hours starting at 3:00 p.m. the previous day, that he was tired, and that he was on his way home to New Jersey, combined with the fact that there are not any significant cities along Interstate 80 for a substantial distance from where he was stopped. Additionally, the fact that Mr. Wallace said he was quite successful in his construction business, yet he was driving a 1995 Saturn minivan across the country in the middle of the night is worthy of some weight in the reasonable suspicion calculation. When viewed through Trooper Ekberg's training and experience, these facts taken together are sufficiently unusual to create some suspicion which, when taken as part of the totality of the circumstances, merit further investigation.

The insurance card discussion has some significance. While having a proof of insurance card overnighted to a driver while on vacation is not, standing alone, indicative of illegal activity, it appears that Mr. Wallace might have quickly come up with the most plausible explanation he could think of when he was caught off guard by a question that didn't fit with the vacation story

---

[125] See *Simpson*, 609 F.3d at 1152 n.3.

[126] Transcript, page 42, lines 1-10.

[127] Transcript, page 69, lines 1-14.

he had given. Again, while a very minor fact, it has some weight in the overall reasonable

suspicion analysis.

While none of these articulated facts indicate illegal activity by themselves, and none of

them standing alone create reasonable suspicion to detain Mr. Wallace, taken together with all of

the other facts known to Trooper Ekberg they add to the reasonable suspicion analysis under the

totality of the circumstances standard.

### d.      Totality of the Factors

In the final analysis, the facts in this case are similar enough to *Simpson* that its reasoning

and conclusion should be followed. The *Simpson* Court stated:

> In essence, we are asked to decide whether a police officer who has lawfully
> stopped a person is allowed to continue to detain that person for a short period
> of time when that person has a criminal record of drug trafficking, is acting
> extremely nervous in a situation where others typically relax, and provides
> evasive answers that describe a fairly implausible travel plan. . . .
> [W]e conclude that Trooper Bowles had reasonable suspicion that criminal
> activity was afoot, and thus, had the right to briefly detain Mr. Simpson for
> further investigation.[128]

As in *Simpson*, Mr. Wallace's record of prior criminal activity enhanced the suspicious

nature of the other factors.[129] The significance of Mr. Wallace's prior criminal record is even

more pronounced because he denied the prior drug arrest shown on that record. This case is

stronger than *Simpson.* Under the totality of the circumstances, Trooper Ekberg had a reasonable

suspicion that criminal activity was afoot, and thus had the right and duty to briefly detain Mr.

Wallace for further investigation.

---

[128] *Simpson*, 609 F.3d at 1153.

[129] *Id*.

### 3. The Search Was Based on Probable Cause

If a motorist is lawfully detained, an officer is permitted to "inquir[e] into matters unrelated to the justification for the traffic stop,"[130] and he may take other actions that do not constitute "searches" within the meaning of the Fourth Amendment, such as conducting a dog-sniff of the vehicle's exterior, that do not lengthen the roadside detention.[131] As determined above, "reasonable suspicion of criminal activity justified detaining [Mr. Wallace] beyond completion of the traffic infraction investigation."[132]

In order to immediately confirm or dispel his suspicion, Trooper Ekberg deployed his trained drug-detecting K-9 to conduct an exterior sniff of the defendant's vehicle. Use of a police K-9 was the least intrusive means available to Trooper Ekberg to confirm or dispel his suspicion that there were drugs being transported in the defendant's vehicle. The period of detention for the dog sniff beyond the initial justification for the traffic stop was relatively brief. The narcotics K-9, within a couple of minutes of being deployed, alerted on the Wallace vehicle. An alert by a trained drug-detecting dog, without more, provides law enforcement officers with probable cause to search the vehicle.[133] Based on that probable cause, the search of Mr. Wallace's vehicle was lawful.

### 4. Consent to Search Was Not Revoked

Trooper Ekberg twice asked Mr. Wallace for consent to search his van, and was twice told to "go ahead."[134] When told to get his coat and exit the van, however, Mr. Wallace asked,

---

[130] *Arizona v. Johnson*, 555 U.S. 323, 333 (2009).

[131] *Illinois v. Caballes*, 543 U.S. 405, 408-09 (2005); *United States v. Parada*, 577 F.3d 1275, 1281 (10th Cir. 2009).

[132] *Rodriguez v. United States*, 575 U.S. ___, 135 S.Ct. 1609, 2015 WL 1780927, at *8 (April 21, 2015).

[133] *United States v. Ludwig*, 10 F.3d 1523, 1527 (10th Cir. 1993); *United States v. Ludwig*, 641 F.3d 1243, 1250-51 (10th Cir. 2011).

[134] Transcript, page 55, lines 14-20.

"can I go to a hotel?"[135] Trooper Ekberg responded to that question by repeating the question, "can you go to a hotel?"[136] Mr. Wallace then responded, "I want to go to a hotel and lay down."[137] Trooper Ekberg responded to that by saying, "let's back up."[138] Trooper Ekberg did not proceed with a search of the van at that point. Rather, he and Mr. Wallace engaged in more conversation regarding the arrest report, and with Mr. Wallace's permission, Trooper Ekberg ended up returning to his patrol vehicle to double check Mr. Wallace's criminal history.[139]

While Trooper Ekberg awaited confirmation from dispatch on the criminal history, he had a discussion with Trooper Terry who was on his way to Trooper Ekberg's location. Trooper Ekberg explained to Trooper Terry that Mr. Wallace had given consent to search the vehicle, but then asked about a hotel.[140] Trooper Ekberg then told Trooper Terry that he was "going to run Sarge or keep trying to have him let me search his van."[141] Although this conversation indicates some confusion on whether he still had consent to search the vehicle, Trooper Ekberg testified that he believed the consent given by Mr. Wallace was still valid and had not been revoked.[142]

The "Fourth Amendment is satisfied when, under the circumstances, it is objectively reasonable for the officer to believe that the scope of the suspect's consent permitted him to [conduct the search that was undertaken]."[143] If the request contains limiting language, the

---

[135] Transcript, page 89, lines 15-17.

[136] Transcript, page 89, line 22 through page 90, line 3.

[137] Transcript, page 90, lines 4-7.

[138] Transcript, page 56, lines 13-16.

[139] Transcript, page 58, lines 5-8; page 63, lines 9-10; Video at 4:16:04.

[140] Transcript, page 93, lines 11-14.

[141] Transcript, page 93, lines 16-17.

[142] Transcript, page 60, lines 4-7; page 62, lines 16-21; page 94, line 15 through page 95, line 6.

[143] *United States v. Garcia*, 56 F.3d 418, 423 (2nd Cir. 1995) (citation and internal quotation marks omitted).

officer can be held to that limitation.[144] Any consent given must be clearly and unequivocally

revoked.  For example, consent was deemed not to be withdrawn when a defendant expressed

impatience with the length of time a search was taking.[145] Nor was consent deemed to be

withdrawn when a property owner who had given consent for a search his property stated,

"[m]aybe I should speak with my lawyer."[146] Failure to object to a search is evidence that the

search is within the scope of the consent given.[147]

Mr. Wallace did not clearly and unequivocally withdraw the consent to search his van

that he had twice given to Trooper Ekberg. First he asked a question, "can I go to a hotel?" Next

he made the statement that he wanted to go to a hotel. Rather than conduct an immediate search,

Trooper Ekberg asked some clarifying questions about the overall situation and about Mr.

Wallace's criminal history. Then Trooper Ekberg took the less intrusive step of deploying a

narcotics sniffing K-9 before conducting a search of the van based on the dog's alert to the odor

of narcotics. Mr. Wallace did not object to the dog deployment or to the search of the van. Mr.

Wallace did not revoke his consent to search his van by stating that he would like to go to a

hotel. Therefore, in addition to the reasonable suspicion to detain Mr. Wallace for the brief

period necessary to deploy the dog, and the probable cause the dog's indication created to

support a search, the vehicle search was also lawfully conducted under valid consent.

---

[144] *United States v. Elliot*, 107 F.3d 810, 815 (10th Cir. 1997).

[145] *United States v. Brown*, 345 F.3d 574, 581 (8th Cir. 2003).

[146] *United States v. Mata*, 517 F.3d 279, 291 (5th Cir. 2008).

[147] *United States v. Pena*, 143 F.3d 1363, 1368 (10th Cir. 1998).

## ORDER

Based on the reasoning set forth above,

IT IS HEREBY ORDERED that the Motion to Suppress[148] is DENIED.

Dated May 13, 2015.

BY THE COURT:

David Nuffer
United States District Judge

---

[148] Docket no. 19.